# EXHIBIT D

**Commissioners**
Marisel A. Hernandez, *Chairwoman*
William J. Kresse, *Commissioner/Secretary*
Jonathan T. Swain, *Commissioner*

Lance Gough, *Executive Director*



For Immediate Release: April 20, 2017

# Election Board Enters Settlement Agreement with Justice Department on Accessible Polling Places

The Chicago Election Board has entered a settlement agreement after a 10-month joint effort with the U.S. Justice Department and Chicago-based Equip for Equality to evaluate the physical accessibility of polling places and Early Voting sites. The Board anticipates that several hundred precinct polling sites will need some forms of permanent or temporary modifications or will need to be re-located.

Using newer standards under the Americans with Disabilities Act (ADA), the Department of Justice began examining polling places and Early Voting sites during the March 2016 Primary Election. Similar examinations have been launched in other major cities around the country and in downstate Illinois.

Starting in June 2016, the Chicago Election Board staff began meeting with the Justice Department to review preliminary findings from the Primary. The Election Board teamed with a leading local disabilities-advocacy organization, Equip for Equality, to create a plan for a more comprehensive evaluation of the city's 2,069 precincts at the November 2016 General Election. This joint effort averted litigation.

"Equip for Equality worked closely with the Justice Department and the Board, and then recruited hundreds of attorneys from several corporations and law firms across Chicago to work pro bono on this project," said Election Board Chairwoman Marisel A. Hernandez. "These 'investigators' completed training and were supplied with the tools to measure sidewalk cracks, curb cuts, ramp angles, interior and exterior doorway widths, the amount of pressure needed to open doors and other aspects of sites that might have one or more barriers that could impede the access for a blind voter or a voter in a wheelchair."

Prior to the Settlement Agreement, the Board already had begun to work with public agencies whose sites may have been exempt from the newer rules for their main purposes, such as schools, parks, libraries or other facilities, or because they had an alternate entrance that was not used by voters on Election Day. However, to be used as polling places, some of these sites now will need modifications, such as adjustments to ramps or doors.

Under the terms of the Settlement Agreement, the Board will work with public and private property owners to bring as many polling places as possible into compliance starting with the March 2018 Primary election, with the goal of 100% ADA compliance by the November 2018 General Election.

# # #

**SETTLEMENT AGREEMENT
BETWEEN THE UNITED STATES OF AMERICA AND THE
BOARD OF ELECTION COMMISSIONERS FOR THE CITY OF
CHICAGO, ILLINOIS
DJ# 204-23-255**

---

This settlement agreement (the "Agreement") is entered into as of April 11, 2017 ("Effective Date"), between the United States of America and the Board of Election Commissioners for the City of Chicago, Illinois (collectively, the "Parties").

## BACKGROUND

1. In February 2016, the United States Department of Justice (the "Department") conducted a compliance review of polling places under the jurisdiction of the Board of Election Commissioners for the City of Chicago, Illinois (the "Board") under Title II of the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12131–12134, and the Department's Title-II-implementing regulation, 28 C.F.R. Part 35, to determine the accessibility of the Board's polling places to persons with disabilities.

2. Pursuant to State law, it is the duty of the Board to divide the City of Chicago into election precincts, each of which shall be situated within a single congressional, legislative, and representative district insofar as is practicable, and in not more than one county board district and one municipal ward. Such precincts shall contain, as near as practicable, 400 voters. It is also the duty of the Board to appoint the polling place in each precinct. State law requires that all polling places shall be accessible to voters with disabilities, as determined by rule of the State Board of Elections.

3. The Board has in excess of 2,000 precincts for elections. One polling place site may house one or more polling divisions. In the spring of 2016, the Board had 1,452 polling place sites that housed 2,069 precincts.

4. In addition, it is the duty of the Board under State law to conduct "Early Voting" beginning the 40th day preceding Election Day in the Board's central office and at other temporary and permanent Early Voting polling place locations throughout the City of Chicago beginning on the 15th day preceding Election Day. For the March 2016 Primary Election, the Board used 50 temporary and permanent Early Voting polling place locations at remote locations.

5. Pursuant to State law, the Board reviews the accessibility of each potential polling place. The Board then designates them as "accessible," which indicates compliance with State guidelines, or "not fully accessible." In order for a facility that has been designated "not fully accessible" to be used as a polling place in an election, the Board must apply for and receive an exemption from the State Board of Elections.

6. If an individual with a disability is assigned to a polling place that has been designated "not fully accessible," he or she may obtain curbside voting assistance by submitting a written request to the Board by 5:00 pm the day before the election.

7. It is the Department's position that the exemption and curbside voting provisions are inconsistent with the ADA, which requires that jurisdictions select polling places that are or can be made accessible so that individuals with disabilities can vote on the same terms and with the same level of privacy afforded to others. 28 C.F.R. § 35.130(a). Nevertheless, in the rare circumstances that the Board is unable to select an accessible polling-place location that otherwise meets the requirements of this Agreement, then the Board may apply to the Department to use the program-accessibility provisions of Title II using the procedures set forth in Paragraph 26 of this Agreement. *See*, 28 C.F.R. § 35.150(b).

8. Based on polling-place reviews conducted during the March 2016 Primary Election, the Department concluded that many of the Board's "accessible" polling places as determined by rule of the State Board of Elections in fact contain, under the ADA, barriers to access for persons with mobility disabilities and persons who are blind or have other vision disabilities.

9. In response to the Department's initial findings, the Board engaged Equip for Equality ("EFE") to inspect over a thousand Chicago polling places not surveyed by the Department during the March 2016 election, and to serve as a consultant to assist the Board in identifying all ADA non-compliance issues relating to the Board's polling places. EFE, the federally mandated Protection and Advocacy system for people with disabilities in Illinois, is uniquely qualified to support the Board in this capacity, given its prior ADA polling-place experience in previous Illinois elections and pursuant to its statutory role under the Help America Vote Act.

10. In collaboration with the Board, EFE deployed over 200 staff and trained volunteers during the November 2016 General Election to review the accessibility of nearly all of the Board's polling places not previously inspected by the Department. Using a survey instrument modeled after the Department's ADA Checklist for Polling Places (June 2016), EFE found additional instances where polling-place locations were not accessible to voters with disabilities under the ADA.

11. The Board, a separate entity created under the laws of the State of Illinois, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131–12134.

12. The Department is authorized under 28 C.F.R. Part 35, Subpart F, to determine the Board's compliance with Title II of the ADA and the Department's Title-II-implementing regulation, and to resolve the matter by informal resolution, such as through the terms of this Agreement. If informal resolution is not achieved, the Department is authorized to issue findings, and, where appropriate, to negotiate and secure voluntary compliance agreements. Furthermore, the Attorney General is authorized, under 42 U.S.C. § 12133, to bring a civil action enforcing Title II of the ADA should the Department fail to secure voluntary compliance pursuant to Subpart F.

## TERMS OF SETTLEMENT

### Obligations of the Board

#### A. Accessible Voting Program

13. Accessible polling places at accessible sites are and shall be the cornerstone of the Board's voting accessibility program. The Board has an obligation to provide an accessible voting program under federal law, including a program that is accessible to persons with mobility disabilities and persons who are blind or have other vision disabilities. 42 U.S.C. § 12132. The Board's Title-II obligations require it to select facilities to be used as polling places that do not exclude individuals with disabilities from or deny them the benefits of the polling place, or otherwise subject them to discrimination, 28 C.F.R. § 35.130(b)(4); and to administer its voting program in the most integrated setting appropriate to the needs of persons with disabilities, 28 C.F.R. § 35.130(d).

14. For all elections beginning with the March 2018 election, the Board will begin implementing the recommendations set forth in Paragraph 18 to ensure that by the November 6, 2018 election, each and every polling-place location is permanently or temporarily accessible during the voting period and will relocate inaccessible locations to an alternative accessible location pursuant to the process established by Paragraph 24 of this Agreement.

15. The Board shall maintain in operable working condition on Election Day and during Early Voting those features of facilities and equipment (including, but not limited to, permanent equipment such as lifts and elevators, and temporary equipment such as portable ramps, traffic cones, signs, wedges, and door stops) that are required to make polling places accessible to and usable by persons with disabilities. 28 C.F.R. § 35.133(a). If circumstances arise such that a polling place location that was previously accessible is no longer accessible because a feature of the facility or equipment is no longer operable, then the Board shall purchase new equipment or relocate the polling place to an alternative, accessible location in accordance with Paragraph 24 of this Agreement, notwithstanding any provision in State law.

16. Beginning with the March 2018 election, if off-street parking is provided to voters at a polling-place location, a minimum of one van-accessible parking space will be provided in a level area temporarily during the voting period through the placement of traffic cones and appropriate signage, or in some other equally effective manner.

17. The Board will cooperate fully with the Department's efforts to monitor compliance with this Agreement including, but not limited to, providing the Department with timely access to polling places (including during the early-voting period), ward maps, surveys, and other reasonably requested information.

18. The Board agrees that the following temporary measures will be implemented where necessary to make an otherwise inaccessible polling place temporarily accessible during the voting period. This list is not exhaustive; the Parties may agree to implement other, reasonable temporary measures.

      a. Portable ramps (including curb ramps) up to and including ramps six feet long, with side edge protection.

      b.      Portable wedges or wedge ramps.

      c.      Floor mats.

      d.      Traffic Cones.

      e.      Relocating furniture or other moveable barriers.

      f.      Door stops.

      g.      Propping open doors.

      h.      Unlocking doors.

      i.      Signage, including parking signage.

      j.      Portable buzzers or doorbells.

      k.      Removing astragals in doorways that are not a permanent part of the structure.

### B. Survey, Compliance and Review of Polling Place Locations

19.    In fulfilling the requirements of this Agreement, the Board will continue to engage EFE or some other third-party expert acceptable to both the Parties (either of which may be referred to herein as the "Third-Party Expert") as a consultant, and will enter into a separate agreement with the Third-Party Expert outlining the terms of this relationship. Under this separate agreement, it is anticipated that the Third-Party Expert will review all of EFE's polling place surveys from the November 2016 election and determine whether there are changes that can be implemented to make inaccessible polling places either temporarily or permanently accessible, or whether alternative locations need to be identified and designated as polling places; assist the Board with Election Judge training and material development; deploy Third-Party Expert staff and volunteers to survey polling places in the March 2018 election and subsequent elections to confirm that the remediations have been fully implemented; and deploy Third-Party Expert staff and volunteers during the March 2018 election and subsequent elections to address accessibility problems.

20.    By June 1, 2017, the Third-Party Expert will review all polling place surveys from the November 2016 election and provide to the Board and the Department all of the November 2016 surveys. By September 15, 2017, the Third-Party Expert will provide its recommendations for implementation of temporary or permanent modifications for each polling place location found to be inaccessible. If no such remedies are available, the Third-Party Expert shall communicate this to the Board so that it can begin its search for an alternate site, as described in Paragraph 25.

21.    Beginning with the effective date of this Agreement, the Board and/or the Third-Party Expert will survey the polling places not surveyed in 2016 by the Department or EFE that it intends to use in future elections, using the survey instrument referenced in Paragraph 34 of this Agreement. The Board will provide these surveys to the Department within 21 days of inspection, with all surveys to be completed by July 1, 2017.

22. If the Department concludes that a survey was conducted in error, then the Board will re-survey the portions in error. If the Department concludes that the Board or the Third-Party Expert has proposed a remedial provision that does not address the violation, then the Department will recommend a temporary remedial measure consistent with Paragraph 18 of this Agreement that the Board will implement in the next election. If the Board chooses not to or is unable to implement one or more of the recommended temporary remedial measures, it will relocate the inaccessible polling-place location to an accessible polling place-location selected pursuant to the process established by Paragraph 24 of this Agreement.

23. By the November 6, 2018 election, the Board will implement appropriate remedial provisions recommended pursuant to the 2016 surveys completed by the Department and EFE, and additional surveys conducted after the effective date of this Agreement, to make all polling-place locations temporarily accessible during the voting period, or will relocate inaccessible locations that cannot be made temporarily accessible to an alternative accessible location pursuant to the process established by Paragraph 24 of this Agreement.

24. After the effective date of this Agreement, the Board shall select new polling-place locations that are accessible to persons with disabilities. 42 U.S.C. § 12132. It shall be the Board's policy and practice to review each newly proposed polling-place location to determine whether it is accessible to persons with disabilities or could be made temporarily accessible during the voting period with the remedial measures provided for in Paragraph 18 of this Agreement, before the Board's selection of the location as a polling place. The Board shall use the survey instrument referenced in Paragraph 34 of this Agreement to make all future polling-place selections. If the Board ultimately determines that a newly proposed location is not accessible (as defined by the survey instrument) or cannot be made temporarily accessible during the voting period, then the Board will reject the location and continue searching until an accessible location or one that can be made temporarily accessible during the voting period can be found.

25. If the Board selects a new polling-place location, it will provide the Department notice of its decision-making within 21 days of the decision. The Board will provide the Department with copies of all surveys and photographs conducted pursuant to Paragraph 24 of this Agreement within 21 days of the decision to use the location as a polling place and prior to the location being used in an election. The Department's approval must be obtained prior to the location being used in an election. The Department's approval will be based exclusively on whether the proposed polling-place location satisfies the survey instrument referenced in Paragraph 34 of this Agreement.

26. If the Board finds that it cannot implement a recommendation regarding a specific polling-place location, the Board will immediately notify the Department and, upon request, meet and confer with the Department. If the issue cannot be resolved to the satisfaction of the Department, the Board will relocate the site to an alternative accessible location pursuant to the process established by Paragraph 24 of this Agreement.

27. Nothing in this Agreement precludes the Board from using "vote centers" if authorized by State law and compliant with all applicable federal statutes, provided that each vote center shall be accessible to voters with disabilities and the Board complies with its obligations set forth in Paragraphs 24 and 25 of this Agreement. For purposes of this

Agreement, a "vote center" means a polling place where a voter who resides in the city of Chicago may vote regardless of the precinct in which the voter resides.

### C. Training

28.  Prior to each election during the term of this Agreement, the Board will provide training to all in-precinct Election Coordinators on how to implement the temporary remedies (*e.g.*, how to install ramps, or the placement of mats over (and not in front of) thresholds). As part of its training programs for Election Coordinators and Election Judges, the Board will provide training concerning temporary remedial measures, including: (a) why such measures are necessary, and; (b) the obligations of polling-place personnel not to interfere with, move, or otherwise change the temporary remedies in place at their assigned polling place location for the entire voting period.

### D. Election Day Compliance Review

29.  In the materials provided to each in-precinct Election Coordinator, the Board will include a checklist of the temporary measures to be implemented during the voting period at each polling place location where such measures are required. The checklist should contain a place for the Election Coordinator's signature affirming that he or she kept the temporary remedies in place throughout each day of the voting period, from the opening of the polls to their closing, and should be returned to the Board along with other election materials. Copies of these checklists will be provided to the Department within 21 days of the election.

30.  If a temporary remedy is not in place at any time during the voting period, the Election Coordinator should contact the person designated by the Executive Director of the Board to respond to accessibility problems encountered during the voting period. The designee shall then send Board personnel to fix the non-compliant implementation of the temporary measures when possible. Non-compliance shall be documented by both the in-precinct Election Coordinator for that polling place location and the designee. The Board will provide copies of this documentation to the Department within 21 days of the election.

31.  If the Board does not properly implement the temporary remedial measures necessary at a particular polling place location during the voting period in an election, it will provide a detailed explanation to the Department for its failure to do so. If after providing this explanation and conferring with the Department the Board determines it will not be able to implement the temporary measures during the next election, it will no longer use the polling place location and shall relocate it to an accessible location or one that can be made temporarily accessible during the voting period pursuant to Paragraph 24 of this Agreement.

### Obligations of the Department

32.  In order to assist the Board with its obligations under the ADA, the Department has provided the Board with information from the Department's March and November 2016 reviews of the Board's polling place locations, including the violations found and recommendations for how to make each location temporarily accessible on Election Day, as applicable. The Board will obtain information from EFE's November 2016 review through the procedure described in Paragraph 20.

33. Throughout the duration of this Agreement, the Department may conduct compliance review surveys or reviews of the Board's polling places in each election or at any time with reasonable notice.

34. The Department will provide assistance to the Board on devising and using a new survey instrument that will be based on the Department's ADA Checklist for Polling Places (June 2016) and will help assess whether a newly proposed polling-place location is or can be made temporarily accessible during the voting period. The survey instrument will include a requirement to include photographs and will also require the identification of appropriate remedial provisions, including the remedial provisions in Paragraph 18 of this Agreement. The survey instrument will be submitted to the Department for review and approval within 21 days of the effective date of this Agreement.

## Enforcement Provisions

35. If at any time one of the Parties to this Agreement desires to modify any portion of this Agreement, it will promptly notify the other Party in writing, setting forth the facts and circumstances thought to justify modification and the substance of the proposed modification. An in-person meeting between the Parties will be held at the request of either Party. The Party receiving a request to modify the Agreement will not unreasonably delay notifying the requesting Party as to whether it will agree to the proposed modification. No modification will take effect unless and until the Parties memorialize the agreed-upon modification in writing.

36. In consideration of the mutual promises contained in this Agreement, good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to avoid the costs, expenses, and uncertainty of protracted litigation, the Parties, intending to be legally bound, enter into this Agreement.

37. In consideration of, and consistent with the terms of this Agreement, the Department agrees to refrain from filing any civil suit related to the accessibility of Chicago's polling places for voters with disabilities until the day after four years from the effective date of this Agreement, except as provided in Paragraph 38 of this Agreement.

38. The Department may review compliance with this Agreement at any time. If the Department believes that the Board has failed to substantially comply in a timely manner with any requirement of this Agreement, the Department will so notify the Board in writing and attempt to resolve the issue in good faith. If the Department is unable to reach a satisfactory resolution of the issue within 30 days after providing notice to the Board and allowing the Board an opportunity to cure, the Department may institute a civil action in federal district court to enforce the terms of this Agreement or take other action to enforce Title II of the ADA.

39. Failure by the Department to enforce this entire Agreement or any other provision of it with regard to any deadline or any other provision of the Agreement will not be construed as a waiver of the Department's right to enforce other deadlines and provisions of this Agreement.

40. A copy of this document will be made available to any person by the Board or the Department on request.

41. This Agreement shall be applicable to and binding upon both Parties, their officers, agents, employees, and assigns.

42. This Agreement constitutes the entire agreement between the Parties on the matters raised herein, and no other statement, promise, or agreement, either written or oral, made by either Party or agents of either Party, that is not contained in this written Agreement will be enforceable. This Agreement does not purport to remedy any other disputes regarding the ADA or any other federal law, except to the extent they are related to the accessibility of the Board's polling places to voters with disabilities.

43. This Agreement will remain in effect for four years from the effective date.

44. The person signing for the Board represents that he or she is authorized to bind the Board to this Agreement.

**For the Board of Elections Commissioners of the City of Chicago:**

_____
Lance Gough, Executive Director

Date: 4-11-2017

**For the United States of America:**

JOEL R. LEVIN
Acting United States Attorney

By: _____
Patrick W. Johnson
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300
patrick.johnson2@usdoj.gov

Date: 4-12-2017